MEMORANDUM OF DECISION
I. Procedural:
This case presents a co-terminus petition for the termination of the parental rights of Lynn L. and James L., who are the biological parents of a minor child whom the court shall refer to as Baby L. The child was born on July ll, 1996 and is presently well adjusted and living in a foster home. The child is now sixteen months old.
The court heard five days of testimony by seventeen witnesses, including Dr. Richard Sadler, a psychiatrist, and Dr. David Mantell, a licensed clinical psychologist. The trial commenced on September 15, 1997, and concluded on September 19, 1997. A briefing schedule agreed to and extended by agreement concluded on November 10, 1997. All briefs were received by CT Page 12179 November 5, 1997.
The court has carefully considered the testimony of the witnesses, the documents, reports, photos, audio tape and visual tapes entered into evidence, and the legal arguments advanced by counsel. From these sources the court makes all of its findings by clear and convincing evidence, that is proof sufficient to satisfy the court beyond an average certainty.[2]
The statutory authority for a coterminous petition is embodied in Sections 46b-129, 17a-112 and 45a-717 of the Connecticut General Statutes. "When neglect and termination proceedings are coterminously filed, the court is required to proceed in three separate stages. See In re, EmmanuelM., 43 Conn. Sup. 108, affd 35 Conn. App. 276, 278,648 A.2d 881, cert. denied 231 Conn. 915, 648 A.2d 151 (1994)." Quoting from In re Carla Marie F., (Keller, J.) May 6, 1996.
The first stage involves an allegation of neglect. The court must first determine, by a fair preponderance of the evidence, that the child has been neglected as of the date the petition was filed or last amended. See, In re Juvenile Appeal
(84-AB), 192 Conn. 254, 263, 471 A.2d 1380 (1984). The petitioner has alleged and must prove by a fair preponderance of the evidence that Baby L. has been neglected in that he has been abandoned; as well as denied proper care and attention; and also that he has been permitted to live under circumstances injurious to his well-being; and finally that he has been abused in that he has been deprived of necessities.
If the evidence does not support a finding of neglect, then both petitions must be dismissed. If, however, the court adjudicates the child as neglected or uncared for, disposition is deferred until a decision is made on the termination petition.
The second stage consists of a determination, by clear and convincing evidence, whether there exist grounds to terminate the parental rights of James and Lynn. The petitioner alleges that Baby L has been abandoned by his parents in the sense that they failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child; and that Baby L has been denied, by reason of act or acts of commission or omission by his parents, the care, guidance or control necessary for his physical, educational, moral or emotional well-being. CT Page 12180
The third stage of the proceedings relates to the disposition of the case. "If grounds have been found to adjudicate the child neglected or uncared for, and to terminate parental rights, applying the respective standards of proof, the court must then consider whether the facts as of the last day of trial, establish, by clear and convincing evidence, after consideration of the factors enumerated in Section 17a-112 (d), that termination is in the best interest of the minor child." See, In re Carla Maire F., May 6, 1996 (Keller, J).
II. The Missing Infant
Baby L. was born on July 11, 1996. Seven weeks later the child was reported missing from the parent's third floor apartment at 95 Highland Avenue in Torrington. There are two distinctly different accounts of how that came to pass. The parents say that the infant was abducted by an unknown kidnapper. The police believe another person Carol Brooks, who claims to have been a participant in a scheme with the parents to sell the child. Even the parents seem to agree that this case rises or falls on the credibility of the testimony of Carol Brooks.
At 7:21 p. m. on August 21, 1996, Torrington Police Department received a 911 call from the child's mother, Lynn. She reported that Baby L. was missing. The recorded phone conversation details the mother informing the police dispatcher that "someone walked into the apartment and took my son". On the tape, the Mother sounded relatively calm and composed, neither crying nor hysterical during this initial phone call to police.
The parents lived in a third floor apartment at 95-97 Highland Avenue. On the ground floor was a convenience store. On the second floor, directly below the parents, lived an older female neighbor, Shirley and her dog, Piper. Shirley was particularly friendly with Lynn. The owner of the building, the landlord of James and Lynn, was Jerry Petrovits.
While there were several slight discrepancies in the details, the gist of the parent's account as later described to Detective Corrine Silano was that the mother, Lynn, reported that earlier that same afternoon around 3:00 p. m. she heard the downstairs door to the apartment open. Lynn asked "who's there?" She brought the baby down the stairs to the apartment front door; no one was there. At around 7:00 p. m. she and her husband, James, went in to CT Page 12181 the bathroom to have a cigarette. She told Detective Silano that neither she nor her husband smoke around the baby. Lynn said she put the baby on the bed, because the baby doesn't sleep in the crib often. When she and James returned from the bathroom the baby was gone. She said they had been in bathroom for about five minutes. The baby's personal effects were still on the bed.
Detective Silano further testified that the disappearance of Baby L. "seemed to have brought the Torrington community together out of concern for the baby and the [parent's]. The entire police department was involved, Connecticut [State Police] Major Crimes Squad, the FBI and volunteers were called in, everyone wanted to help. "
III. The Parties
A. The Mother Lynn was 28 years of age in August of 1996. She reports a relatively normal childhood as the middle of three children. She graduated from high school and attended some college courses dropping out far short of completing the degree requirements. She had been in a relationship with James for about ten years to the distress of her parents and two siblings. She secretly married James on May 16, 1993. No friends or family attended the marriage ceremony. There was no honeymoon and Lynn continued to use her maiden name around family and friends. She and her husband observed holidays by themselves at their separate families homes. Lynn's family did not find out about the marriage until after the child was reported missing.
Reports from neighbors and families report to a stormy relationship between the two. Lynn appeared to her friends and family as very dependent and subservient to James. Her husband controlled the finances of the household and selfishly spent all available funds on his own pursuits, a train collection, computers and aquarium fish. James did not tell Lynn how much money he made or how he spent it, as that was "none of her business." He did not use his money to pay the rent and as a consequence they were about eighteen months behind in their rent.
Shirley Allen testified that she lived on the second floor, directly below the parents, Lynn and James, and became a close confidante of Lynn. Ms. Allen lives alone with her pet dog, Piper. Prior to the birth of Baby L., Lynn would visit Allen daily for coffee at about two in the afternoon; additionally Shirley spent approximately two or three evenings per week CT Page 12182 visiting with the couple upstairs at their studio apartment.
During the afternoon coffee-breaks, Shirley stated that she and Lynn would talk about everything, including Lynn's agitated relationship with her husband. Shirley testified that about two or three times per week Lynn would cry to her, appearing visibly upset about her marital problems. Lynn and James fought "frequently," often about financial issues. Tracy W., Lynn's sister, confirmed this; she reluctantly described the relationship between her sister and James as "pretty turbulent."
Ms. Allen testified that sometimes, when Lynn was upset and cried about her relationship with James, she would offer Lynn advice. Shirley testified that she told Lynn two or three times that she should leave her husband. Lynn refused to leave, however, stating "maybe I should but I love him." According to Lynn's sister, Tracy, Lynn did leave the relationship, at least on four or five different occasions but always returned to James. Tracy testified that after she had helped Lynn move out four times, she stopped helping because "Lynn always went back to James." She said that her sister would only stay with the family for "about a week" before returning to James. Lynn told a DCF worker that she left her husband five times during their ten-year relationship for "stupid things" such as her husband's failure to support her, provide her food, buy her clothing and pay the rent.
Ms. Allen testified that Lynn spent her days cleaning the couple's studio apartment or "looking for a job". According to Shirley, James would leave his wife "lists" of things to do each day. Lynn complained to Shirley that if "things were not done the right way according to Jamie", he would insist that she keep cleaning day after day, until her work met with his level of satisfaction.
Ms. Allen testified that she personally did not think that James's demands and expectations of his wife were appropriate. Shirley told Lynn that she "should just stop cleaning for a few days." Lynn admitted to Shirley that she could not possibly "just stop" because it wasn't "an option"; if things on the list were not completed per her husband's level of satisfaction, he would "get mad". Consequently, Lynn spent her days "crawling in closets, repackaging boxes," and complying with her husband's demands as specified by his list.
Ms. Allen testified that a source of marital discord between CT Page 12183 the couple was that there "was not enough money to go around" and that "Jamie was always on Lynn to get a job". Allen explained that Lynn felt much pressure from her husband "to find a job and to go to work." Allen explained that Lynn told her that Jamie disconnected the cable TV connection, so it wouldn't be a temptation for Lynn to watch TV during her daytime hours at home. James told Lynn, ". . . since I have to work, you can go out, get a job and then you can hook up cable again", according to Shirley.
Both Shirley and Tracey, however, testified that James had no hesitation to spend his money as he pleased, often purchasing trains, computers and coins for his collections, but Lynn very seldom had money for anything, including money for groceries or even toilet paper. Shirley testified that "Jamie told Lynn that he was not going to buy anymore toilet paper, she was using too much, if she wanted it, she could go to work." After the child was born, Lynn did not have sufficient funds for clothes for the baby or for food. Shirley knitted a blanket and sent meals upstairs to be sure they had food to eat.
Lynn's sister testified that her family helped Lynn financially too; the family gave Lynn money when she requested it, and purchased groceries such as milk, bread and coffee. Tracy even gave her an old car as a gift so she could get around but that "[James] would not give her money for gas, I or my mom would."
Another irritant in the marriage of James and Lynn involved another woman. Ms. Allen testified that just prior to the conception of Baby L., Lynn told her that she feared that her husband was "falling out of love with her." Lynn confided in Shirley that she thought James had a "girl" friend; this woman left notes on the car for James and stopped by the apartment to see him. Lynn's sister Tracey stated that Lynn "knew that her husband had cheated on her." Ms. Allen testified that Lynn was initially quite upset about her husband's alleged involvement with this woman.
Ms. Allen said that "Lynn came across as willing to do anything, to satisfy Jamie." Lynn's sister also testified that James was very controlling of Lynn. "I think that it is possible that Jamie could have talked my sister, Lynn, into having some one take the baby. I think that Jamie has that much control over my sister." (Petitioner's Exhibit #1) Similarly, Dr. David CT Page 12184 Mantell testified that based upon the couple's interview his assessment was that James is very dominant and Lynn, submissive. "James, speaks for the couple."
B. The Father. Because of presently pending criminal charges, the DCF social worker was only able to get limited information about James. He did not report, for example basic personal data such as his birth date, his early life experiences, his complete education or other social history. From the psychological report of Dr. David Mantell (Petitioner's Exhibit # 28) it appears that as of January, 1997, James was 26 years of age, three years younger than his wife, who is now nearly thirty. He reported that he was born in Minnesota, raised in Connecticut and has a 10th grade education. He admits to having to repeat the 10th grade and having had special education classes in high school. He has worked in a landscape maintenance job for four years.
This is his only marriage. His wife, Lynn, has had three pregnancies by him, two terminating in abortions, ". . . because they were not financially stable at that time and it was not in the child's best interest," (for the child to be born) as he explained to Dr. Mantell[3]. He has a sister whom he describes as also having been conceived out of wedlock as he had been. He does not know his sisters paternity. He reports that his biological father and his mother broke up two days after he was born. He does not know why. James told Dr. Mantell that he left home at the age of fifteen or sixteen because his stepfather shot a window out with a rifle while he (James) was walking down the driveway. Lynn's family told the social worker that James was forced to move in with his grandmother after his mother's boyfriend pointed a gun at him and shot around him. They reported that James' mother then threw James out, choosing his stepfather over him. (Petitioner's Exhibit # 23). The step-father was arrested for this episode.
James reported that his stepfather was alcoholic and cocaine addicted. His mother might have had a nervous breakdown. He admits to one psychiatric hospitalization because his school sent him away for a couple of weeks to Danbury Hospital, though he does not know why. He told the social worker that he had been hospitalized on two occasions while in high school, once for depression. DCF reports his other hospitalization was for suicidal ideation. James reported that his wife was raped by a neighbor though he does not know at what age. Lynn emphatically denied any rape when asked by Dr. Mantell. She said that James CT Page 12185 had been physically abused as a child, but that she would let James tell Dr. Mantell about that.
James also admitted to DCF a history of heavy substance abuse with alcohol and marijuana. He would not comment on his present usage except to say that he was very much in control. Neither parent would agree to allow DCF to test them for the presence of drugs in their system until after ninety days from their arrest.
When asked about his wife's most recent pregnancy he said things were looking up financially at the time. His wife was working but she was terminated from her employment when she notified her employer that she was pregnant on the day she was to be eligible for insurance benefits. He said the State paid for the delivery and his wife had to demonstrate their income, which was just a bunch of paperwork.
When asked about his interests and hobbies James told Dr. Mantell about his computers, HO scaled trains, coins and woodworking. He said he spent $3,000 to $5,000 on HO trains and $1,500 on his computer. He also spent money on maintaining his two cars and feeding and clothing two people.
Dr. Mantell concluded:
 The father's history is conspicuous for conduct disorder with antisocial features, emotional distress leading to psychiatric hospitalization (he acknowledged one hospitalization to me but apparently two hospitalizations to others) and also for substance abuse in addition to paternal abandonment, mistreatment by his stepfather, and emotional rejection by his biological mother who apparently chose the abusive stepfather over her relationship with her son. The father may have had a history of some learning difficulty and he appears to have had considerable difficulty supporting himself as well as his wife and child accumulating large debts while financially indulging his personal hobbies and interests . . . James} appears dominant in his relationship with his wife who barely speaks in his presence though she is quite capable of expression when seen independently. The relationship observations made during joint parent interviewing are consistent with actuarial test results which indicate that the father has a need to control others and the mother to subjugate herself to an authority that she esteems.
IV. Police Investigation[4]
CT Page 12186
The first police officer to arrive at the scene was officer James Whiting. The parents were awaiting his arrival. He found it odd that they were not looking for the child. On his way to the apartment he had been looking for someone carrying an infant. He did not see anyone. After full investigation, no neighbors reported any suspicious persons with an infant.
The parents showed him the apartment and told him that the child had been taken while they were in the bathroom having a cigarette. The officer observed ashtrays throughout the apartment, as well as ". . . quite a collection of working and non-working computers."
Whiting stated that once inside the studio apartment that he was "surprised" that the bed was still made because there was no evidence that the parents had previously searched the bedding area for the baby. Whiting recalls that "[a] slight imprint of the baby remained on the pillow, and the pacifier was still perfectly in place on the pillow. The imprint was on the far right hand corner of the bed on top of the pillow." Officer Whiting believed that the reaction of the mother was not the kind of hysteria that one would expect, endlessly searching and grief beyond expression. He was also baffled by the response of James to the events. James was calm. He told the policeman that the child was a mistake ". . . it shouldn't have happened." He seemed more disturbed by the fact that he had to give up his train collection to make space for the baby. His tone bothered the officer. Neither parent asked any of the police officers, at any time, if they could join in the search for the child.
Whiting testified that he went through the garbage in the apartment to eliminate it as a possible location for the baby. Whiting discovered letters and a torn up note in the garbage, as well as, baby clothes, which were described as being in "good condition."
The police interviewed Shirley Allen. She told the police and testified in court that between 7:00 and 7:15 p. m. on the evening that Baby L. was reported missing, she was home. She said that she had a dog. Her dog, Piper, always barked as soon as someone attempted to open the downstairs entry door which was the access to the third floor apartment. Ms. Allen told the police that the "dog barked at everyone but James" and on August 21, 1996, her dog, although home with her, did not bark during the time in CT Page 12187 question.[5]
Detective Corinne Silano indicated that father's demeanor was very unreactive, emotionless, and quiet. Detective Silano testified that in her seventeen years of experience, she too considered James's reaction to the disappearance of his son to be "inappropriate". Unlike Whiting, Silano confronted James on his lack of emotion. Silano testified that she explained to James that it was unheard of for parents not to react, that usually parents are hysterical under these circumstances. James told Silano that he doesn't express his emotions outwardly, that he keeps his feelings inside.
Detective Silano further noted that she found it "odd" and highly suspicious "that at the exact time the parents were in the bathroom, someone took the baby." Silano testified that based upon the physical set up of the apartment and the location of the staircase, it would be virtually impossible for someone to enter the apartment without being seen or heard. Silano also testified that she is quite familiar with the geographic area where the alleged abduction occurred and that it is a "high traffic area" making it highly unlikely that someone could take the baby and not be seen. Silano stated that "she never heard a story like this one before" and found it highly implausible.
Michael R. Emmanual, a patrol sergeant, testified that he interviewed Lynn at the police station. He told her about Mrs. Allen's dog barking every time someone came up the stairs and the dog didn't bark at the time the child was reported missing. He confronted Lynn and said that no stranger had come up those stairs.[6] He further told her that things "didn't fit;" it was unlikely a stranger would pick out this apartment in an active section of town, the third floor, during daylight hours, that someone would know that the child was unattended at that very moment that the parents were in the bathroom having a cigarette. Sgt. Emmanual believed Lynn was considering this and then ". . . she snapped out of it, saying `My baby is missing, someone took my baby.'"
Lynn and James gave contradictory reports about their marriage,[7] about their parenting difficulties, or that they were in financial distress. Dr. Sadler stated that "[n]either parent provided a consistent, coherent, or plausible explanation regarding their own development, family life, relationship together or adult interactions." They did admit to a year and a CT Page 12188 half delinquency in their rental payments, credit card debt and phone bills, as well as the fact that Lynn went "on the State" to pay for the birth and delivery. Lynn told Sandra Fitzpatrick, the social worker from DCF, that James was working a part time job, "with the erratic schedule and seasonal nature expected of the work"[8] but with full time hours. It had been a stressful week because James' father was coming to visit and they had to clean the apartment. Lynn admitted that her husband spent his money on computers, trains and fish tanks even though he owed 18 months of rent at $410 per month. ($7380 by the court's calculation). She said she was glad that she had been accepted into WIC[9] since she would no longer have to ask her husband for the money for milk.
The parents also denied having any problems with respect to the care of the infant. James told Dr. Sadler "none that I can recall." In Officer Whiting's inspection of the garbage he had found a handwritten note that had been ripped up. The note was reconstructed, typed and admitted into evidence. It read as follows:
 Why do you mistreat the baby. Why at 2 or 3 in the morning for the past two weeks does it sound like your torturing the baby. Do you really believe your a responsible adult. Do you know how to take care of an infant. Not by-shut the fuck up, move your fucking leg, oh are the wipes to cold for you. What the hell do you think your doing. Who the hell told you that's how you treat your son, and right now, I don't even like the idea of calling that baby your son. Get up and walk away from a crying defenseless son. To have a smoke or piss. You expect me to jump when that baby cries. He's crying for a reason, and I think he'll take a lot longer that a month before he will be able to sleep during the night, Until then, If you can't feed him fast and change him! Show him a little comfort in the middle of the night. Don't call yourself his father, because you haven't grown up yet. It's 4:05 AM and I don't feel any more tried then I've been in the past month of having this child. I can't believe it. You find that computer more important then the care and growth of that baby. You have pissed me off to no end. I can't believe how ignorant you have been. (Punctuation, spelling and grammar as in original, Petitioner's Exhibit #8)
Lynn admits writing the note when she was angry. She had also reported this event to her sister Tracy prior to the child's disappearance. CT Page 12189
V. The Reluctant Co-conspirator.[10]
Carol Brooks testified that she first met Jerry Petrovits, the parent's landlord and a bail bondsman, in July, 1996, when he bonded her out of jail. Carol Brooks has a bachelor of science degree in nursing and a masters degree, but has fallen on some hard times due to her drug addiction problems. Ms. Brooks testified that although she has been in recovery for approximately two years she has a history of addiction to prescription drugs. Brooks has also been arrested and convicted for criminal violations of the law including the offense of obtaining controlled substances by fraud. At the time of Brooks' most recent arrest involving the alleged plot to sell Baby L., she was involved with the criminal justice system in connection with another arrest and was participating in substance abuse treatment program at Danbury Hospital. Her only son has been the recipient of DCF services and has remained out of her care and custody.
She became intimately involved with Jerry Petrovits soon after he bailed her out of jail. Ms. Brooks testified that at the end of July 1996, approximately two weeks after she met Petrovits, he introduced her to James and Lynn. The introduction occurred outside of the convenience store Petrovits leased out on Highland Avenue, the building in which the parents were his tenants.
Ms. Brooks next saw James and Lynn the night the foursome went to the Twin Colony Diner in Torrington for dinner. Brooks testified that although she was unsure as to the date of the dinner together, she recalled the time. Around 7:00 to 7:30 p. m., she, Lynn and the baby drove together from Petrovits home to the Twin Colony Diner. They were seated at a table to await the arrival of Jerry Petrovits and James. Brooks recalls spending approximately twenty minutes alone with Lynn and the baby before the men arrived. Brooks states that the conversation with Lynn mostly focused on the baby; Lynn described how her husband was always yelling at the baby for crying at night.
According to Brooks, after James and Petrovits arrived at the restaurant there was general conversation among the foursome. Lynn remained at the table holding the baby while James. smoked his cigarettes in the presence of the child. Carol said that James and Lynn did not talk directly to each other, nor did they appear affectionate. After dinner, Brooks drove Lynn and the baby CT Page 12190 back to Petrovits home in Goshen. Petrovits and James returned to Petrovits' house in a separate vehicle. Later, Petrovits left to drive James and Lynn and the baby home to Highland Avenue.
Brooks said that she spent approximately two hours with the parent's that evening. She said they developed a plan. Her role was to drive over to the store, James would give her the baby. "Jerry told me the bond would be forgiven." There would be no cash for her. It was her understanding that Petrovits had a lesbian sister living out of state who had come into some money and wanted a child. Petrovits had planned to split the profits from the baby sale with the parents.
Margaret Strachan who worked as a waitress at the Colony Diner testified. She observed and, was the waitress for, the foursome the night they came to the Colony Diner. She was able to identify Brooks in a police photo array consisting of eight women of similar appearance.(Petitioner's Exhibit # 35) She knew Mr. Petrovits, independently of that dinner meeting, as a bail bondsman whom she had seen at the police station[11]. Her testimony fully confirmed that the parents knew, and had dinner with Carol Brooks and their landlord Jerry Petrovits shortly before the "abduction".
Brooks further testified that she knew prior to August 21, 1996, that Petrovits had a plan for the baby. Brooks understood that her role was to care for the baby on a short term basis; she testified that she was a reluctant participant in the plot and was unsure as to the ultimate destination of the baby. Brooks stated that although she agreed to participate in the plan, she knew it wasn't right but did it anyway because Petrovits promised to forgive her arrears and because she was afraid not to go along with the plan. According to Brooks, Petrovits had ongoing concerns regarding the parent's ability to appropriately care for their infant son. Both she and Petrovits believed that the parents were drug involved.
Brooks testified that on August 21, 1996, she went to the courthouse in Bantam to appear for her pending criminal case. After court, she telephoned Petrovits and asked for directions to his house from the courthouse in Bantam ". . . since I didn't know where he lived.". Brooks testified that she drove to Petrovits house in Goshen and when she arrived, he was on the phone dealing with issues relating to his bonding business. The two intended to spend the afternoon on his boat, however, CT Page 12191 Petrovits wanted to go to the store and purchase beer before departing.
She drove with Petrovits to the convenience store he owned on Highland Avenue. Petrovits went inside to buy the beer and Brooks remained in the jeep with his two dogs. It was about 3:00 or 3:30. While Petrovits was in the grocery store, Brooks stated that she took one of the two dogs for a short walk to the nearby side street. Shortly thereafter, Petrovits returned to the jeep and they drove back to his house. The two went out on the boat, spending approximately an hour or an hour and a half on the water. While on the boat, Brooks' beeper went off; when the page was returned she knew that she had to work that evening. They returned to the house because Brooks needed to get ready for work.
Just before Brooks left for work at about 6:30 p. m., Petrovits told her that she needed to pick up the baby on her way back to her apartment, assuring her that he would retrieve the baby before she needed to go to work that evening at eleven. Petrovits handed her paper and a pencil asking Brooks to scribble down the parent's name, address and phone number. Brooks testified that she asked Petrovits for some cash and he handed her several twenty dollar bills telling her to "take what she needed".
At around 6:45 p. m., Petrovits handed her directions so that she could find her way to Highland Avenue in Torrington and also gave her an envelope. Brooks testified that, at the time, she did not know the contents of the envelope, she was in a hurry and quickly tossed it in her back-seat before driving away. On the way to Highland Avenue, Brooks testified that she changed the license plate marker to her car. Brooks explained that Petrovits gave her the license plate; it came from the garage at his house. Petrovits told her to change the license marker before picking up the baby; he claimed she needed to follow his suggestion for her protection.
When she arrived at Highland Avenue, she parked on the same side of the street as the convenience store, slightly up from the store. Brooks observed James approaching the car from the right hand side, he was holding Baby L. Brooks states that she opened the door and that James placed the sleeping infant in the car. The baby was wrapped in a colorful blanket and James deposited the child on the front seat without a car seat. Although she CT Page 12192 asked James for supplies to care for the baby, he quickly left the infant stating "Just go" before walking away from the car. "No formula, no diapers, no car seat, I didn't know anything about feedings. I knew they lived in the building, but I had never been to their apartment, I didn't know what floor they lived on."
Brooks left in her car with the baby, stopping at K-Mart in Southbury for "a little outfit, some diapers a bottle and some formula". That evening Brooks tried to contact Petrovits but she was unable to reach him by phone, consequently she did not go to work as planned. The next morning on August 22, 1996, Brooks went to Danbury Hospital for her methadone treatment, stopped at the AP and a consignment shop to pick up additional supplies for the baby. Thereafter Brooks drove with the baby to Pawling, New York to work her normal 12 noon to 8 pm shift. She arrived at around noon time and left in the late afternoon around five o'clock, because the baby was cranky. Brooks testified that she continued to try to reach Petrovits, but remained unable to contact him.
After leaving work, Brooks went to see a friend. It was at this point that Brooks watched the news and discovered that the parents had told the police that Baby L. was allegedly "kidnaped". Brooks testified that she was frantic and left her friend's house, returning to her apartment. Upon arriving home, Brooks went to her apartment leaving the baby alone in the locked car.
The Brookfield Police Department found the baby in the locked car; the child was placed in protective custody and Brooks was arrested. At the time of Brooks arrest, the Brookfield Police Department found the "envelope" in the back-seat of the car. The envelope contained blank birth certificates and social security cards.
Brooks admitted that she gave several statements to law enforcement involving the incident; she openly admitted that she initially made some misrepresentations to police in an effort to "protect Jerry Petrovits". Brooks testified that she was not entirely truthful because she feared for her safety. She said she was fearful of Petrovits, ". . . that he would put me back in jail. I had heard horror stories about what he does to people when he bonds them out." Since that time, however, Brooks testified that she is no longer trying to protect Petrovits and has been consistent and truthful. CT Page 12193
Jerry Petrovits was interviewed on August 22, 1996, at approximately 11:00 PM by the Torrington Police. Petrovits was sure that Brooks was not involved in the abduction. During the police interview Petrovits began to vomit into the garbage pail. When asked why he was vomiting, Petrovits answered "this entire event has made me nervous." The police officer concluded that Jerry Petrovits was not being truthful. (Petitioner's Exhibit # 10). The court finds the testimony of the witness Carol Brooks to be credible and plausible in her explanation of the events of August 1996. The court further finds the explanation of events by the parents to be inconsistent, implausible and not true.
ADJUDICATION[12]
Dr. Mantell concluded his report as follows:
"I found similar circumstances surrounding each of the three unplanned pregnancies.[13] These are strained financial circumstances including an immense debt at the time of the third, a self-indulgent pattern to the father's spending and then an end to parenting responsibility with an early abortion, then a delayed abortion, and finally a sudden disappearance of a near new-born child. I did not find parental statements persuasive and credible on key issues." (The concluding paragraph of Petitioner's Exhibit # 28). The court concurs with Dr. Mantell's analysis.[14]
1. With respect to the Allegation of Neglect:
General Statute § 46b-120 defines a "neglected" child as one who (A) has been abandoned or (B) is being denied proper care and attention, physically educationally, emotionally or morally or (C) is being permitted to live under conditions, circumstances or associations injurious to his well-being or (D) has been abused. The statute is not carefully crafted. Neglect, by definition means to omit, fail or forbear to do a thing that can be done, or that is required to be done. Black's Law Dictionary
Rev'd. Fourth Ed. West Publishing Co. Whereas, the act of abandoning or abusing a child requires an intentional act on the part of an actor, not the mere omission or failure to perform an act.
In keeping with the agency's well established policy of claiming every available ground, whether they apply or not, a CT Page 12194 policy encouraged by our Attorney General's office, the petition in this case claimed the parents in this case were neglectful on grounds (A), that the child was abandoned (B), that the child was denied proper care and attention, (C) that the child was permitted to live under conditions and circumstances or associations injurious to his well-being, and (D) that the child has been abused. General Statute § 46b-120, defines "abuse" as "a child or youth (A) has had physical injury or injuries inflicted upon him other than by accidental means or (B) has injuries which are at variance with the history given of them or (C) is in a condition which is the result of maltreatment such as, but not limited to malnutrition, sexual molestation, deprivation of necessitites, emotional maltreatment or cruel punishment." There was no evidence offered in support of the latter three grounds. Those grounds, that the child is being denied proper care and attention, physically educationally, emotionally or morally, that the child is being permitted to live under conditions, circumstances or associations injurious to his well-being, and that the child was abused, are dismissed.[15]
The ground that applies in this case, based upon the facts alleged, is that the parents neglected their child in that they abandoned the child. Abandonment focuses on the parent's conduct.In re Michael M., 29 Conn. App. 112, 614 A.2d 832
(1992); In re Rayna M., 13 Conn. App. 23, 36,534 A.2d 897 (1987); In re Kezia M., 33 Conn. App. 12,632 A.2d 1122 (1993). Abandonment in the law historically required the concurrence of two aspects, an intent to voluntarily relinquish a thing by an owner, and some overt act or failure to act which carries the implication that the owner neither claims nor retains any interest. Stinnett v. Kinslow 238 Ky. 812,38 S.W.2d 920, 922 (1931).
Our legislature has defined abandonment as follows "[a] fail[ure] to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . ." General Statutes 17a-112 (b) (1). Statutory abandonment does not require an intent to abandon totally and permanently. Litvaitis v.Litvaitis 162 Conn. 540 (1972).
Abandonment in the context of a neglect proceeding further implicates the parents rights and obligations of parenthood. The rights of a parent to a child include the right to the care, custody and management of their child Santosky v.Kramer, 455 U.S. 745, 753-754 (1982). "The commonly CT Page 12195 understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." In re Juvenile Appeal (Docket9489), 183 Conn. 11, 15, 438 A.2d 801 (1981) quoting Inre Adoption of Webb, 14 Wash. App. 651, 657, 544 P.2d 130
(1975). The Connecticut Supreme Court defines abandonment as "such conscious disregard and indifference by a parent to his parental obligations as to evince a settled purpose to forego his obligation and duties to his child." See, In re, JuvenileAppeal, 187 Conn. 431, 441, 446 A.2d 808 (1982)
The court finds by clear and convincing evidence, a higher standard than required, that the parents of this child, acting in concert with others, conspired to abandon this child within the contemplation of the child protection laws of this state. Specifically, the court finds that the parents abandoned this child by placing the child into the stream of commerce for personal financial gain. In order to complete the act of abandoning the child, the father, acting with the acquiescence of the mother, delivered the child to Carol Brooks, thereby conclusively relinquishing, physically and symbolically transfering, [transferring], their parental rights to the child. The court finds that this act evinced a settled purpose to forego their parental obligations and duties to his child.
2. With respect to the statutory grounds for termination ofparental rights:
Having found that the child was neglected by the parents, the court may now consider whether grounds exist to terminate their parental rights. The petitioner claims two grounds:[16] 1) the child has been abandoned by the parents in the sense that the parents have failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child and 2) the child has been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for the his physical educational or emotional well-being. The same evidence can be used to establish more than one ground for termination. In re Shannon S., 41 Conn. Sup. 145, 157,562 A.2d 79, affd, 19 Conn. App. 20, 560 A.2d 993 (1989). CT Page 12196
The legal definition for statutory abandonment within the context or termination proceedings is defined in General Statutes § 17a-112 (b) (1) as "[t]he parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child." The standard of proof in the neglect proceeding is a fair preponderance of the evidence. The standard of proof is greater for termination of parental rights; clear and convincing evidence. This court is satisfied that the evidence, clearly and convincingly establishes that the parents displayed such a conscious disregard or indifference to their parental obligations as to evince a settled purpose to forego their obligations and duties to this child. The court finds that the parents have abandoned this child within the contemplation of § 17a-112 (b) (1) in that they have exihibited complete irresponsibility for the well-being of this child.
With respect to the second ground that the child has been denied by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical educational or emotional well-being, the court finds that this ground has also been established by clear and convincing evidence.
"This provision authorizes the termination of parental rights where specific acts of parental commission or omission have caused serious physical or emotional injury to the child."In re Kelly S., 29 Conn. App. 600, 614, 616 A.2d 1161
(1992). See also In re Theresa S., 196 Conn. 18, 25-27,491 A.2d 355 (1985); In re Sean H., 24 Conn. App. 135,144-145, 586 A.2d 1171, cert denied, 218 Conn. 904, 588 A.2d 1078
(1991).The language of General Statutes §. 17a-112 (c) (3) (C) does not limit the grounds to acts resulting in physical injury only, In re Theresa S., supra; In re SeanH., supra, but may also apply to an act of omission which results in emotional injury to a child. This court finds that placing the child in commerce, delivering the child to Carol Brooks constituted the act of abandoning the child, an act of commission. The court further finds that the emotional insult to the child, the dimensions of which are not yet known, of being given away in exchange for modest monetary reward, is certainly a type of serious emotional injury contemplated by this statute. "The parental decision to give up a child means the child is unwanted." J. Goldstein, A. Freud, A. Solnit, Before theBest Interests of the Child, 36 (1979) Counsel for the child agrees: "Nevertheless, it would be a mistake to assume that the CT Page 12197 fact of having been unwanted remains without repercussions. . . . [Such children] may develop ideas about their own unworthiness which made the `real parent' give them away. They may fear that, for the same reason, abandonment will be repeated. On the other hand, they may deny their resentment about the rejection and imagine that they have been `stolen,' i.e. kidnaped against the parents' will." J. Goldstein, A. Freud, A. Solnit, Beforethe Best Interests of the Child, supra footnote pp. 36-37. "[t]he callousness and the circumstances surrounding his sale for rent insure that Baby [L.] will face additionally painful awareness of the meaning of being an "unwanted" and "abandoned" child. (Brief of the Child's Attorney)
3. Waiver of the one year requirement:
The court finds that these grounds have not existed for more than one year preceding the date of the petition. The court may direct that "from the totality of the circumstances surrounding the child that a waiver of the one year statutory requirement is necessary to promote the best interest of the child." The determination of the question of the appropriateness of a waiver is within the trial court's sole discretion. In re, RomanceM., 30 Conn. App. 839 (1993); In re, Christine F.,6 Conn. App. 360 (1986). The waiver is particularly appropriate in a case such as this, given the parents heinous conduct and their refusal and/or inability to acknowledge their conduct, it is not likely that within a reasonable time considering the age and needs of the child, such parents could assume a responsible position in the life of the child. General Statutes 17a-112 (c) (3) (B). The court is particularly mindful that the statute makes special provisions for a waiver in cases of abandonment of children younger than six months of age. The court waives the one year requirement in order to promote the best interest of the child.
4. Mandatory Findings pursuant to § 17a-112 (e):
With respect to the mandatory findings required by General Statutes § 17a-112 (e):
1) The timeliness, nature and extent of services offered. The court finds that psychological and psychiatric services were offered. Given the nature of the parent's conduct as alleged by the Department of Children and Families, and as found by the court to be true, offering services beyond that was CT Page 12198 inappropriate. Dr. Sadler stated: "[w]ith the degree of parental pathology, their impaired parenting abilities and their disregard for their child's welfare would determine that rehabilitative efforts, in my opinion would not be in the best interest of the child." (Petitioner's Exhibit #26.)
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the Adoption Assistance and Child Welfare Act of 1980. The court finds that under the circumstances of this case, considering the nature of the act and the parental pathology as more fully described in the reports of the court ordered evaluators, efforts to reunite this child with these parents would have been wholly unwarranted.
3) The terms of applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations, etc. No expectations were set as this is a co-terminus proceeding. See answers one and two above.
4) The feelings and emotional ties of the child with respect to the parents and foster parents, etc. The court finds that the child was abandoned by these parents at age seven weeks. Whatever bonds may have existed were precipitously ended by the conduct of these parents. No presently existing emotional bonds will be broken by termination of the parents rights.
5) As to the age of the child. The child is 16 months of age. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children.In re Juvenile Appeal (84-CD), 189 Conn. 276 (1983). The Appellate Court has also correctly noted, "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence . . ." In reAlexander V., 25 Conn. App. 741, 748, 596 A.2d 930 (1992); see generally, JOSEPH GOLDSTEIN, ET AL., BEYOND THE BEST INTERESTS OF THE CHILD (1979).
6) The efforts the parents have made to adjust their circumstances or conditions. The court finds that the parents have been unsuccessful in making any meaningful attempt to adjust their circumstances, conduct or condition to facilitate reunification. The parents continue to be in denial with respect to their conduct and accordingly cannot make progress as parents.
7) The court finds that the parents have been prevented from CT Page 12199 maintaining a meaningful relationship with the child following their abandonment of the child. The lack of visitation was due to the failure of the parents to seek visitation and then later, when the father tepidly inquired about visitation on advice of counsel, the consulting therapist concluded it was not in the child's best interest. There was no unreasonable conduct noted by DCF.
6. Best interests of Minor Child
 "A parent of ordinary intelligence would know that to place a child in the stream of commerce, absent the safeguards and protections afforded by adoption, is itself the severance of the ongoing parent-child relationship which the state did not cause but can seek only to ameliorate through permanent placement in an adoptive family."
(Brief of the Child's Attorney p. 9)
"Our statutes and case law make it crystal clear that the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence." In reValerie D., 223 Conn. 492, 511, 613 A.2d 478 (1992). Here the court has found that grounds exist to terminate the parents' rights to the child. The court has also considered the mandatory findings of § 17a-112 and concludes from the totality of circumstances that termination of parental rights is in the child's best interest. This finding is made after considering the child's sense of time, his need for secure and permanent environment, the relationship the child has with their foster parents and the totality of circumstances. In Re: JuvenileAppeal, (anonymous) 177 Conn. 648, 667-668, 420 A.2d 875
(1979). See generally, J. Goldstein, A. Freud and A. Solnit,Beyond the Best Interests of the Child (1979). This finding is consistent with the recommendations of Dr. Sadler and, also of Dr. David Mantell, who, summed up the entire case during his testimony: "The act of giving up a child is so final, it represents a rejection of the child, and a rejection of parenthood that can't be overcome."
DISPOSITION
Based upon the foregoing findings, the court determines that it is in Baby L.'s best interest for a termination of parental rights to enter with respect to the mother Lynn L. and the male CT Page 12200 biological parent, James L., and accordingly a termination of their parental rights is ordered. It is further ordered that the Commissioner of DCF is appointed statutory parent for this child for the purpose of securing an adoptive family. The commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to effect such permanent placement and file further reports as are required by State and federal law.
Francis J. Foley, Presiding Judge Child Protection Session